IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ALREE B. SWEAT III,

        Plaintiff,

v.                                                                  CIV 04-1329 KBM/LCS

LAS CRUCES CITY POLICE
DEPARTMENT, et al.,

        Defendants.

# <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff instituted this civil rights action *pro se* under 42 U.S.C. § 1983, and is

proceeding *in forma pauperis* under 28 U.S.C. § 1915.  *See Doc. 4.*  It arises out of two searches

where evidence was seized and used to support a burglary/larceny conviction.  That conviction

was overturned by the state courts, and the prosecutor later dropped the charge.  Plaintiff has

been incarcerated throughout this suit, however, on a different charge from the one at issue here.

*See Doc. 39* at 2.  As I previously observed:

> Plaintiff's Complaint as well as his responses to Defendants'
> motion variously describes Defendants' conduct in the December
> 1999 search and the other search[] prior to his arrest for the
> burglary as "malicious," abusive," "unlawful," "illegal,"
> "unreasonable," "warrantless," "sadistic," and "false arrest."  He
> also claims that the Chief of Police was aware of the "illegal"
> conduct and permitted it to occur.  Sweat further asserts that he
> was detained beyond the expiration of his sentence and that this
> constitutes "cruel and unusual punishment."  He seeks a staggering
> amount of damages as well as declaratory and injunctive relief
> under 42 U.S.C. § 1983 for these alleged violations of his civil
> rights. *See Doc. 1* at 2; *id.* (attachments entitled "Prayer for

Relief"); *see also id.* (attachments entitled "Supporting Facts,"
¶ 6); *id.* (attachments entitled "Nature of the Case," ¶13); *Doc. 21* at 1.
*Doc. 23* at 3-4.

I denied Plaintiff's initial request for counsel and Defendants' motion to dismiss on statute of limitations grounds, and then ordered  the submission of a *Martinez Report.  See, e.g., Docs. 2, 7, 23.*  The matter is presently before the Court on Defendants' *Martinez* Report and motion for summary judgment *(Docs. 24 & 25)*, Plaintiff's various responses to the motion *(Docs. 32, 3, 42 & 44)*, and Plaintiff's "Motion For A Directed Verdict" *(Doc. 36)* which I construe as a cross-motion for summary judgment.

I find that issues of fact preclude a decision on the merits at this juncture, and accordingly, all of the parties' motions will be denied.  Because it appears appropriate to refer this matter for possible appointment of counsel for Plaintiff, however, I will set forth the background and legal issues in some detail.  Also finding that substitution of parties is appropriate, I  will discuss that first.

## I.  Clarification Of Parties & Consent

Plaintiff listed five defendants in his Complaint:  (1) the "Las Cruces City Police Department;" (2) "Wallace Downs," who was specifically identified as a Las Cruces police officer; (3) "Tom England," who was specifically identified as a Las Cruces police officer; (4) "John Doe 1," who was identified in context as an officer; and (5) "John Doe 2 (Chief of Police) et al."  *See Doc. 1.*

From the context of his Complaint and other pleadings,[1] it is evident that Plaintiff seeks

---

[1]     In discerning whether a lawsuit is against a defendant personally or in his official capacity, the caption may be informative but clearly is not

to hold the defendants liable in both their official and individual capacities.[2]  Defendants

apparently reached the same conclusion since they assert qualified immunity for the officers,

which is a defense only to personal capacity suits, and they assert the municipality is not liable

because of lack of showing of an official policy or custom.  *E.g., Kentucky v. Graham,* 473 U.S.

159, 166-67 (1985); *Owen v. City of Independence,* 445 U.S. 622, 657 (1979).

The Department and two originally-named defendants have been represented by attorneys

from the Las Cruces City Attorney's Office throughout these proceedings, and have consented to

have me serve as presiding judge.  *See, e.g., Docs. 15, 17.*   In the *Martinez* Report and motion

for summary judgment, Officers Carlos Wooten and Rob Peterson have been identified as the

other officers who dealt with Plaintiff and Bill Baker as the Chief of Police.  These newly-

identified individuals are also included by counsel as among the "defendants" moving for

dispositive relief.  Therefore, I will order that the Clerk substitute Wooten, Peterson, and Baker

---

> dispositive.  Rather, the Supreme Court has stated that "[i]n many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both.  'The course of proceedings' in such cases typically will indicate the nature of the liability sought to be imposed." . . .  Thus, where the complaint fails to specify the capacity in which the government official is sued, we look to the substance of the pleadings and the course of the proceedings in order to determine whether the suit is for individual or official liability. . . .

*Pride v. Does*, 997 F.2d 712, 715-16 (10th Cir. 1993) (citations omitted).

[2]  *See, e.g., Doc. 1,* "Supporting Facts," ¶ 6 ("Supervisory officials were aware of the illegal action his officers took to apprehend me and took no action against his offence indicating he's allowing them to break the Unites States Constitutional laws."); *id.,* "Request for Relief," ¶¶ C.2, D.2) (seeking compensatory and punitive damages "jointly and severally" against the officers "and Las Cruces City Police Department").

for the "John Doe" Defendants under FED. R. CIV. P. 25(d)(2).[3]  I also conclude that Officers

Wooten, Peterson, and Baker, have consented to have me serve as presiding judge pursuant to 28

U.S.C. § 636(c) and FED. R. CIV. P. 73(b), at least for the purposes of their motion for summary

judgment.  However, I do request that the newly-identified individuals file consent forms to

affirmatively show whether they consent or do not consent to having me continue to preside.

Also raised for the first time in the summary judgment motion is the issue of whether the

Las Cruces City Police Department is the proper defendant to designate for municipal liability.

*See Doc. 25* at 10.  Defendants recognize that the City is, and should be, the municipal defendant,

and they argue that Plaintiff's claims against the "City" and the "City of Las Cruces" must be

dismissed on the merits because of a lack of showing of an official policy or custom.  *See

Doc. 40,* at 9-11.

I disagree with Defendant that the remedy for misnaming the municipal defendant here is

to dismiss Plaintiff's § 1983 claims.  When a Plaintiff sues an officer in his official capacity, it

"is equivalent to suing the City . . ., his true employer."  *Henry v. Albuquerque Police Dept.,* 49

Fed. Appx. 272, 274 n.1 (10th Cir. 2002).  Therefore, even if it is appropriate to dismiss the

police department as defendant, it is improper to dismiss the suit against the municipality where,

as here, Plaintiff alleges a policy or custom, failure to supervise, and/or failure to train caused the

constitutional deprivation.[4]  For these reasons, and because counsel for the City has been on

---

[3]   *See* FED. R. CIV. P. 25(d)(2) ("A public officer who . . . is sued in an official capacity may be
described as a party by the officer's official title rather than by name; but the court may require the
officer's name to be added.").

[4]   *See Ketchum v. Albuquerque Police Dep't,* 1992 WL 51481, at *4 (10th Cir. 1992) ("Inasmuch
as Ketchum specifically alleged that appellees "have or had" a policy which discriminated against
transients, homeless and hobos and that the policy was enforced by local police officials in New Mexico

notice of and has been defending the suit since its inception, I will order the Clerk to substitute the City of Las Cruces for the Police Department Defendant as the real party in interest. *See, e.g., Kentucky,* 473 U.S. at 165-66 ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). It, too, should file a consent form.

## II. Factual Background As Per The Martinez Report Materials

The *Martinez* Report consists of the New Mexico Court of Appeals' decision and police reports. The two exhibits of police reports each consist of multiple entries by different officers and are not sequentially-numbered. My shorthand references for them, as if they were sequentially numbered, are as follows:

- *Doc. 25,* Exh. 1 at 1-2 (*Officer England Report re: 12/22/99*");
- *Id.* at 2-3 ("*Officer Wooten Report re: 12/22/99*");
- *Id.* at 3 ("*Officer Brookreson Report re: 12/22/99*");
- *Id.,* Exh. 2 at 1-2 ("*Officer Downs Report re: 12/22/99*");
- *Id.* at 3-4 ("*Officer Downs Report re: 12/23/99*");
- *Id.* at 5 ("*Officer Downs Report re: 12/24/99*") (duplicated at page 6);
- *Id.* at 7 ("*Detective Pederson Report*"); and
- *Id.* at 8-9 ("*Detective Renn Report re: 12/22/99*").

### A. December 22, 1999 Prowler And Burglary Investigations

On December 22, 1999, at about 8:50 p.m., Officer Downs was dispatched to a residence where a burglary had occurred. The residents had left their home at 7:30 p.m. to go Christmas

---

in violation of his rights, and inasmuch as municipalities are liable for the deprivation of federally protected rights occasioned by the execution of municipality's policy or custom, *Monell, supra,* we hold that the court erred in denying Ketchum's motion to amend to add the municipalities as defendants and in dismissing Ketchum's § 1983 claim."); *Shangreaux v. Midwest City Police Dep't,* 1991 WL 104313 at *2 (10th Cir. 1991) ("The police department of Midwest City is not a suable entity. *See Martinez v. Winner,* 771 F.2d 424, 444 (10th Cir.1985), *modified in part on rehearing,*778 F.2d 553 (10th Cir. 1985) ("Of course, to remedy this defect, Shangreaux needs only to amend his complaint to name Midwest City as a defendant."); *see also, e.g., Doc. 1,* "Supporting Facts," ¶ 6; *Doc. 33,* ¶ 7; *Doc. 42,* ¶ 8.

shopping.  When they returned at an hour later, they discovered that someone had broken the glass out of a back door and stolen several items including Christmas presents.  Officer Downs called for field investigation officers, who took fingerprints from the scene and photographed footprints in the back of the house leading toward an empty field.  None of the police reports indicate that Downs, the victims, or any of the investigators noticed feathers near where the glass was broken or where the presents were missing.  *See Officer Downs Report re: 12/22/99.*

Meanwhile that same night just before 9:00 p.m., a woman was about to leave her home when she saw a tall, young black man dressed in a long dark parka and a brimless cap pulled low over his ears.  He was headed into the carport area toward her front door, and she believed he was attempting to look into her kitchen window. When the man saw her, he moved to the edge of the carport area and stood in the shadows.  The woman called 911, and saw the man move behind her neighbor's tree.  Officer England responded to the dispatch of the prowling report at 9:04 p.m., spoke with the woman, and broadcast a "be on the lookout" alert ("BOLO") for other units in the area.  *Officer England Report 12/22/99.*

### B. Plaintiff Becomes The Suspect In Both Cases

The path of the footsteps from the burglary scene to the empty field led in the direction of where Plaintiff was staying with a girlfriend, and the house where the prowler was seen was also near that girlfriend's residence.  *See, e.g., Officer England Report re: 12/22/99; Officer Downs Report re 12/22/99; Officer Downs Report re: 12/23/99.*  Plaintiff was the immediate and only suspect for both crimes, but the police reports are contradictory on which officer first mentioned Plaintiff as the suspect and why.

It appears Sweat was known to the Las Cruces Police from prior "professional contact"

6

with him, but the extent of their prior contact, type of contact, and general knowledge of Plaintiff

is not apparent from the *Martinez* Report.  The one incident of prior contact with police

mentioned in the police reports was related by Plaintiff himself.  Sweat said that prior to the

events on December 22nd, he had "been stopped by the police getting his bicycle out of a friend's

van who had given him a ride and he was a little bit upset about that [encounter]."  *Detective*

*Renn Report re: 12/22/99.*  Of special note, there is no indication that the officers knew Sweat to

carry a concealed knife.  *See Officer England Report re: 12/22/99.*

According to Officer England, it was Officer Downs who supplied the information that

focused the investigation on Plaintiff.

> I broadcast the information for a BOLO to other units who were
> responding to the area and  was advised by Officer Downs, the
> neighborhood police officer for that area, that he had earlier contact on this
> date with Alree Sweat wearing the same clothing and matching that
> description and that he believed that Sweat was frequenting an apartment
> at . . . Hernandez, Apt. 3.

 *Officer England Report re: 12/22/99.*  According to Officer Wooten's report, however, it was

Officer Rob Peterson, not Officer Downs, who said provided that information.  *See Wooten*

*Report re: 12/22/99.*  Moreover, neither Officer England nor Officer Wooten indicated that they

were informed that Sweat was known to carry a concealed knife.

Contradicting both of the versions above is Officer Downs' own report of that evening.

According to him, Downs did not learn Plaintiff was a possible suspect until ***after*** Plaintiff had

been taken into custody by the other officers.  His report omits any indication that he knew Sweat

or knew of him much less where to locate him or that he had advised Officer England that

Plaintiff should be considered as a suspect in the prowling.  Instead, Downs reported that Sweat

only became a burglary suspect ***after*** Officer England had taken custody of him and Downs'

report suggests that he did not learn Plaintiff's identity until later:

> During my [burglary] investigation I overheard on the radio a prowler call,
> which was in the close vicinity to the burglary I was investigating.  I made
> radio contact with the officers **who had a person detained for the
> prowling later identified as Ellery [sic] Sweat.**

*Downs Report re: 12/22/99* (emphasis added).  As with the other police reports filed about that

evening's events, there is a complete absence of any mention that Sweat was known to carry a

concealed weapon.

### *C.  Warrantless Misdemeanor Arrest & Discovery Of Glass Shard*

Officer England, Officer Wooten, and another officer went to the Hernandez Apt. 3

address where they believed Plaintiff was staying.  They spoke with a woman there, who they

also knew from prior contact,[5] and asked her to have Sweat come to the door.  Plaintiff did so.

Officer England noted that Plaintiff matched the physical description of the suspect, and, while

he was not wearing a parka, he was wearing a "black cap which was pulled down over his head

and upper ears."  *Officer England Report re: 12/22/99.*

The officers asked Plaintiff to step out of the residence.  He complied[6] and

> asked what this was about. [Officer England] advised that he matched the
> description involved in a prowling at a nearby address.  He immediately
> responded that he had gone to that house by mistake looking for another
> female subject.  Alree Sweat was then advised that he was under arrest for
> prowling and voyeurism and he was placed in handcuffs without further
> incident and released to [Officer Wooten] for a custodial search and
> transportation.

---

[5]  As with Plaintiff, the nature and extent of their prior contact with her is not apparent from the
*Martinez* Report.

[6]  In a recent pleading, Plaintiff says he was ordered out at gunpoint.  *See Doc. 42,* ¶ 5.

8

*Id.* Officer England asked the woman to bring him the coat or jacket the Plaintiff "had been wearing a few minutes earlier when he returned to her apartment," and she returned with a "large quilted nylon parka which was dark blue or black in color." *Id.*

Before taking Plaintiff to the station that evening, Officer Wooten patted him down and discovered, among other things, a glass shard in Sweat's right front pocket. When asked "where the glass came from, . . . he didn't give me any answer." *Wooten Report re: 12/22/99.* Officer Wooten's report makes no mention of observing a rip in Plaintiff's jacket, or any indication that the jacket was held together with a safety pin or that feathers were falling out of it. Consistent with Downs' version of the sequence of events, Officer Wooten's report indicates that

> While conducting the custodial pat down Officer Wallace Downs was at [the burglary location] taking a burglary report. He advised me that there were footprints leading from that area to [Plaintiff's address]. We checked the soles of Alree Sweats' tennis shoes and were unable to make a match. Officer Downs had broken glass at his location and when he arrived at the police department the glass found in Mr. Sweat's pocket was similar in diameter to the broken glass found [at the scene of the burglary.]

*Wooten's Report re: 12/22/99.*

Plaintiff was taken to the station, and Officer Brookreson took "an overall photo of Mr. Sweat, including the clothing and jacket that he was wearing." *Officer Brookreson Report re: 12/22/99.* According to Officer England, "it became clear that this was a chance occurrence and the [Plaintiff] had simply gone to the wrong house, alarming the resident."[7] Nevertheless, Sweat was issued a citation for prowling and voyeurism.

---

[7] *See Officer England Report re:12/22/99; see also Detective Renn Report re: 12/22/99* (during the interview at the station, Plaintiff maintained that he and his girlfriend went to dinner between 6:30 and 7:30 p.m., and returned home between 7:30 p.m. and 8:00 p.m.; he then left to go visit a friend, "stayed there for a little while and after that he went looking for a girl [he knew from middle school who] asked him to come by . . . he was knocking on doors attempting to locate her residence").

The officers then told Plaintiff that he was free to go, but asked him if he would stay and talk with them about "other occurrences on this evening."  According to the officers, he agreed to do so voluntarily.  *See Downs Report re: 12/22/99 & Detective Renn Report re: 12/22/99.*  Detective Renn and Officer Downs then questioned Sweat about the burglary.  Plaintiff stated that the pants he was wearing belonged to someone else and related the previous incident involving his bicycle and a van.  Detective Renn advised Plaintiff that because of the glass, he was the main suspect in the burglary case.  Detective Renn's report reflects that Plaintiff was then driven home by Officer Downs.  Yet again the report fails to mention a ripped jacket or protruding down feathers.  *Detective Renn Report re: 12/22/99.*

### D.  Feathers Discovered At The Burglary Scene The Next Day

The New Mexico Court of Appeals was under the misimpression that feathers were seized from Plaintiff's parka on December 22nd.  *See Doc. 25,* Exh. 3 ("In the course of a search incident to the arrest, the officers discovered shards of glass in one of Defendant's pockets, as well as a torn down parka.").  In the record before me, however, not one of the police reports from December 22nd mentions feathers, either at the scene of the burglary or on Plaintiff's jacket.  None of them mention Plaintiff's jacket being torn.  None of them indicate that a knife was concealed in the coat.  None of them indicate that Plaintiff's jacket was seized on that day, and apparently Plaintiff took the coat with him when he left the station.

According to Officer Downs, it was the next day, December 23, 1999, that the burglary victims told him that they had discovered down feathers scattered "throughout the rear door entranceway [and] through the living room area."  *Officer Downs Report re: 12/23/99.*  In response, Officer Downs put in his next report that:

> It should be noted that a subject that was detained in reference to this crime and also a misdemeanor prowling and voyeurism was wearing a down jacket with several tears throughout the jacket that had been safety pinned together. This subject was also found with glass fragments in his right front pocket during a custodial search.

*Id.* This is the first mention of any observation of tears in Plaintiff's coat.

Officer Downs then contacted a Bill Armstrong, an acquaintance of Plaintiff. Armstrong said that Sweat and another person named Leonard visited his house, located just two blocks from the burglary scene, from 7:00 p.m to 7:30 p.m. on the day of the crime. Armstrong further related that Sweat and Leonard returned to his house that evening at 11:30 p.m. and "talk[ed] about a residential burglary that they had been involved in . . . then [Armstrong] slightly change[d] his story and stated that maybe they were talking about being stopped by the police in reference to stolen property." *Id.* Downs' report from December 23rd again does not mention anything about Plaintiff carrying a concealed knife.

### E. Plaintiff Stopped And Patted Down

The next afternoon on December 24th , Officer Downs stopped Plaintiff on the street. His description of the encounter provides in pertinent part:

> while on patrol in a marked unit [with Officer Peterson] when we observed a suspect from a residential burglary that I was investigating. The suspect's name is Alree Sweat. He was observed on a bicycle riding north . .. to the address where he resides. . . . *Due to the fact that he was a suspect for my residential burglary that had occurred approximately a block away, I wished to talk to him regarding the burglary. . . .* Mr. Sweat was asked to step off of the bicycle. *I conducted a frisk search on him due to the fact that he was a felony suspect of a crime, and also due to the fact that he is known to carry a dagger knife type device in the jacket lining of the jacket he was wearing.* After performing frisk search for officer's safety, I observed that there was [sic] down feathers falling out of the tear in the back of his bluish down jacket. There was an approximate six-to-eight inch tear or cut in the jacket that was being held partially together with safety pins. *I observed a clump of feathers falling*

> ***out of the jacket***.
>
> I picked up these feathers as they were falling out and handed them to
> Officer Peterson for possible entrance into evidence for a residential
> burglary in which feathers had been left on the ground.  These feathers
> were put into an evidence bag and handed to the evidence department at
> the Las Cruces Police Department for further analysis and possible sending
> to state crime labs.

*Officer Downs Report re: 12/24/99* (emphasis added).  This report contains the first assertion that

Sweat was known to carry a concealed weapon in the lining of the dark down parka.

### F.  Plaintiff Arrested For Burglary, Convicted, and Conviction Overturned

Plaintiff was not arrested for burglary until January 21, 2000, a month after the encounter

when Officer Downs took the feathers from Sweat's jacket.  Defendants contend that the arrest

was pursuant to a warrant.  However, other than the subsequent Court of Appeals decision, the

*Martinez* Report does not contain any records pertaining to events that took place after December

24, 1999.  Thus, I do not know the results of the forensic tests on the feathers and glass, whether

information about those items was included in the affidavit in support of an arrest warrant, or

what other sworn information was presented to the judge who issued the warrant.

I also know nothing about other contacts the officers may have had with Plaintiff in the

weeks between December 24, 1999 and his January 21, 2000 arrest.  In earlier pleadings, Plaintiff

alleges that from December 22nd to January 21st, he "had several run-ins with [one of the officers,

who] would persist on pat searching me and making me empty my pockets for no reason."

*Doc. 1* (attachments entitled "Nature of the Case," ¶¶ 8, 9); *see also id.,* ¶¶ 1-7; *id.* (attachments

entitled "Supporting Facts," ¶¶ 1-4); *Doc. 22,* ¶¶ 4-12.  Sweat complains that the officer "was

persistant [sic] on warrantless searches.  His excuse was for my safety.  He didn't have any

reason to stop me on my bicycle since no violations were broken." *Doc. 1* (attachments entitled "Supporting Facts," ¶ 4.).  In later pleadings, however, he mentions only the events on December 22nd and December 24th.

The *Martinez* Report does not contain any trial materials, but the record establishes that the trial court denied Plaintiff's motion to suppress, a jury convicted him of residential burglary and larceny in July 2001, he was sentenced to four and one-half years incarceration, and he appealed.  The New Mexico Court of Appeals reversed his conviction on the ground that ***state*** law does not permit a warrantless arrest for a misdemeanor unless it was committed in the presence of an officer, and the officers did not actually observe Sweat prowling.  *See, e.g., Doc. 25,* Exh. 3.  The appellate court further remarked that the feathers and glass fragments were "highly incriminating, and appear to have been the key to the convictions.  Absent this evidence, the record suggests that little if anything linked Defendant to the burglary." *Id.* at 4.  Finding error in the district court's denial of Plaintiff's motion to suppress the feathers and glass, the case was remanded for a new trial. *Id.*

According to Plaintiff, he was released from prison after the Court of Appeals issued its decision.  At some point thereafter, the state refused to pursue the charges further and sent him a "*nolle prosequi.*"  Sweat also asserts that in March 2002 the State dropped the charges thereby "giving [him] until March 12, 2005 to file claim by statute of limitations." *Doc. 22,* ¶ 18. Plaintiff filed this action on November 26, 2004.  Sweat says that he in fact did pursue the matter earlier, both by filing a "lawsuit"on October 24, 2004, the disposition of which was "N/A," and by filing "a grievance, which I never got a reply from." *See Doc. 1* at 4-5, § D.  The *Martinez*

13

Report does not mention any administrative or state proceedings.[8]

## III.  Standard Of Review – Issues Of Material Fact
## Preclude Summary Judgment

Qualified immunity allows state officials to avoid the burden of litigation, trial, and

damages by protecting "all but the plainly incompetent or those who knowingly violate the law."

*Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also, e.g., Garrett v. Stratman,* 254 F.3d 946,

950-51 (10th Cir. 2001); *Gross v. Pirtle,* 245 F.3d 1151, 1155 (10th Cir. 2001).  Thus, if a

defendant raises qualified immunity as the basis for summary judgment, the burden shifts to the

plaintiff to show:  (1) a violation of a constitutional right, and (2) that the violated right was

clearly established as of the date of the offending conduct.  The analysis is based on Plaintiffs'

allegations and conducted in sequential order.  *See, e.g., Brosseau v. Haugen,* ___ U.S. ___, 125

S. Ct. 596, 598 & n.3 (2004) (*per curiam*); *Saucier v. Katz,* 533 U.S. 194, 201-02 (2001);

*Mimics, Inc. v. Village of Angel Fire,* 394 F.3d 836, 841 (10th Cir. 2005); *Roska ex rel. Roska v.*

*Peterson,* 328 F.3d 1230, 1239 (10th Cir. 2003).

Given the purposes underlying qualified immunity, Plaintiffs' burden is "heavy,"

notwithstanding the obligation to view the evidence in the light most favorable to them.  *E.g.,*

*Gross,* 245 F.3d at 1155.[9]  And, even if a plaintiff meets the burden on both questions, a

---

[8]  Court records do not show that he previously filed a suit here.

[9]  A recent Tenth Circuit decision involving a case from this district explained:

> Once a defendant raises a the defense of qualified immunity, "the burden shifts
> to the plaintiff [to] satisf[y] a heavy two-part burden." [quoting *Gross*] . . . Mr.
> Moore argues that the district court was required to accept as true his version
> of the facts.  While it is true, as the district court recognized, that the court may not
> resolve disputed facts on summary judgment, it is not required to accept the
> non-movant's self-serving and conclusory assertions.  *See Garrett v.*

defendant may still avoid trial and liability by showing "exceptional circumstances" that render

his or her "conduct objectively reasonable" under the circumstances.  *E.g., Mimics,* 394 F.3d at

842 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 819 (1982) and *Roska,* 328 F.3d at 1251, and

mentioning factors such as reliance on state statutes and advice of counsel).

But "resolution of qualified immunity may in some instances require a fact-related . . .

determination."  *Garrett,* 254 F.3d at 951 (quoting *Johnson v. Jones,* 515 U.S. 304, 307 (1995)).

Most importantly here, a motion for summary judgment on the issue of qualified immunity,

"does not ignore the fact that, in the end, ***defendant still bears the usual summary judgment***

***burden of showing that no material facts remain in dispute that would defeat the qualified***

***immunity defense.***"  *Gonzales v. Martinez,* 403 F.3d 1179, 1186, n.17 (10th Cir. 2005) (emphasis

added) (citing  *Farmer v. Perrill,* 288 F.3d 1254, 1259 (10th Cir. 2002)), *petition for cert. filed*

*8/31/05.*  While the *Martinez* Report serves to help identify and clarify the issues raised by

Plaintiff and it can be used in conjunction with a dispositive motion, *e.g., Ketchum v. Cruz,* 961

F.2d 916, 920 n.3 (10th Cir. 1992), the court cannot grant summary judgment on unsworn

statements by the officers that themselves are contradictory.  *See, e.g., Hayes v. Marriott,* 70 F.3d

1144, 1148 (10th Cir. 1995).

Indeed, the present *Martinez* Report did clarify the issues.  As I see it, the crux of the

case centers around two issues: (1)  whether a search incident to a warrantless arrest for a

---

Hewlett-Packard Co., 305 F.3d 1210, 1213 (10th Cir. 2002).  **Moreover,**
**"[a]lthough we are required to view the evidence in the light most favorable to**
**the nonmoving party, we must not refrain from examining the evidence**
**altogether."**  *Heartsprings, Inc. v. Heartspring, Inc.,* 143 F.3d 550, 557 (10th
[Cir.), *cert. denied,* 525 U.S. 964 (1998)].

*Moore v. Hernandez,* 2005 WL 758788 at *2 (10th Cir. 2005) (emphasis added).

misdemeanor not committed in the presence of an officer violates the Fourth Amendment to the federal constitution; and (2) whether it is permissible under the Fourth Amendment to stop and frisk the target of a burglary investigation, who previously submitted to voluntary questioning and was released by the police, based solely on the fact that he is a suspect in an investigation.

Defendants do not address the first issue in the appropriate context, in part based on a misreading of my prior opinion and in part based on analyzing state law. Furthermore, the only materials Defendants submitted with the *Martinez* Report are the New Mexico Court of Appeals' decision and police reports. Although these police reports do not necessarily contradict Plaintiff's version of the events, taken as a whole they are themselves either contradictory or incomplete in several material respects. As such, to resolve the matter now I am faced with the necessity to resolve factual discrepancies and/or draw inferences about material facts, which would be inappropriate.

## IV.  Discussion

### A.  Misdemeanor Warrantless Arrests

It is well settled that evidence seized from a search incident to a lawful arrest presents no violation of constitutional rights. Defendants contend that this proposition applies here because, "[a]s the Court had noted, Plaintiff is not contesting his ***arrest*** for the misdemeanor charges." *Doc. 25* at 6. This statement takes my observation out of context. I noted that Plaintiff is not challenging his misdemeanor ***convictions*** in the context of analyzing whether *Heck v. Humphries* would bar consideration of his constitutional claim if it implied the invalidity of the

misdemeanor convictions.[10]  *See Doc.  23* at 4; *see also Doc. 1,* "Request For Relief," ¶ B.1. (Plaintiff seeks injunctive relief to remove the felony charges from his record.).

In the present case, Plaintiff is indeed challenging the validity of the seizure of any evidence seized from the search incident to that misdemeanor arrest.  The New Mexico Court of Appeals determined that the misdemeanor arrest of Sweat was "illegal" ***under state law*** because an officer cannot make a warrantless misdemeanor arrest unless the officer personally observed the commission of the crime.[11]  Having found a violation of state law, the court held that the fruits of the search incident to Plaintiff's unlawful misdemeanor arrest should have been suppressed.  Again, the court of appeals incorrectly believed that the feathers as well as the glass shard were found in the December 22nd search, and ruled that both should have been suppressed at the trial on the burglary charge.  *See Doc. 25,* Exh. 3.

Violations of state law, however, will not support a federal cause of action under § 1983. Rather, the Court must determine what federal constitutional law requires.  *See, e.g, Baker v. McCollan,* 443 U.S. 137, 140, 142 (1979); *Paul v. Davis,* 424 U.S. 693, 697-702 (1976).  Thus, the decisions relied upon by Defendants not only fail to support their arguments, they are beside

---

[10]  Earlier in this litigation it appeared that the state court of appeals held the arrest to be illegal even though I then did not have a copy of the state court opinion.  *See Doc. 23* at 6 (discussing that Plaintiff appeared to fit the *Laurino* exception to § 1983 cause of action accrual – where "***all*** the evidence to be presented was obtained as the result of an ***illegal arrest.***") (additional emphasis added).  Indeed, the opinion as submitted in the *Martinez* Report shows precisely that.

[11]  In so finding,  the state appellate court relied on published decisions ***under state law*** establishing this proposition.  The court explicitly distinguished the 1987 case of *State v. Greyeyes,* 105 N.M. 549, 734 P.2d 789 (Ct. App.), *cert. denied,* 105 N.M. 521, 734 P.2d 761 (N.M. 1987), that involved a misdemeanor arrest for driving while intoxicated, on the ground that motor vehicle accidents are exempted from the "misdemeanor in presence" rule.

the point.[12]

Ordinarily the question first asked in a qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In other words, under the facts of this case, does the Fourth Amendment to the federal Constitution prohibit warrantless misdemeanor arrests for crimes that occurred outside the presence of the arresting officers? Precedent advises that only if I find the constitutional violation should I then proceed to the second part of the analysis and determine if the law was clearly established at the time of the incident. *Id.* (lower courts instructed to decide the constitutional question prior to deciding the qualified immunity question).

However, a recent concurring opinion by Justice Breyer, joined by Justices Scalia and Ginsberg, questions the advisability of unyielding adherence to the sequential analysis as to the applicability of qualified immunity:

---

[12] Defendants argue that the illegality of the misdemeanor arrest was not clearly established as of December 22, 1999. They cite *Barts v. Joyner*, 865 F.2d 1187 (11ᵗʰ Cir.), *cert. denied,* 493 U.S. 831 (1989), which is neither dispositive nor persuasive because it is dissimilar both factually and legally. *Barts* involves the lengthy detention of the person who reported a murder to the police, who eventually confessed.

Defendants also argue that state law was not clear in December 1999, based the portion of the 1985 Court of Appeals decision in *State v. Warren,* 103 N.M. 472, 701 P.2d 194 (Ct. App. 1985), that in turn relies on the reasoning in its own 1985 decision in *State v. Boone. See Doc. 40* at 7. However, Defendants neglect to mention that the Court of Appeals' reasoning in *Boone* was expressly disavowed by the New Mexico Supreme Court in *Boone v. State,* which reiterated that "[w]e have long held that, in the absence of statutory authority, a duly authorized peace officer may make an arrest for a misdemeanor without a warrant only if he has probable cause or reasonable grounds to believe that the offense has been committed in his presence. 105 N.M. 223, ___, 731 P.2d 366, 369 (1987); *see also Doc. 40* at 4. Furthermore, *Boone* was an arrest for a traffic violation, the very line of cases the Court of Appeals distinguished when the State made the same sort of argument in Plaintiff's appeal.

18

> I am concerned that the current rule rigidly requires courts
> unnecessarily to decide difficult constitutional questions when
> there is available an easier basis for the decision (*e.g.*, qualified
> immunity) that will satisfactorily resolve the case before the court.
> ***Indeed when courts' dockets are crowded, a rigid "order of
> battle" makes little administrative sense and can sometimes lead
> to a constitutional decision that is effectively insulated from
> review***, *see Bunting v. Mellen*, 541 U.S. 1019, 1025, 124 S.Ct. 175,
> 158 L.Ed.2d 6360 (2004) (SCALIA, J., dissenting from denial of
> certiorari).  For these reasons, I think we should reconsider this
> issue.

*Brosseau v. Haugen*, ___ U.S. ___, 125 S.Ct. 596, 601 (2004).  Especially in this case, I am

reluctant to proceed with the usual order of the analysis given the following observations.

"If a right is to be recognized as a clearly established constitutional right, 'there must be a

Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority

from other courts.'"  *Tanberg v. Sholtis,* 401 F.3d 1151, 1160 (10th Cir. 2005), *quoting Herring v.*

*Keenan*, 218 F.3d 1171, 1180 (10th Cir. 2000) (compare state law discussion with qualified

immunity under Fourth Amendment discussion).  A 2001 Supreme Court case indicates that the

law on the issue of an "in the presence" requirement is not settled even as today.

> We need not, and thus do not, speculate whether the Fourth Amendment
> entails an "in the presence" requirement for purposes of misdemeanor
> arrests.  *Cf. Welsh v. Wisconsin*, 466 U.S. 740, 756, 104 S. Ct. 2091, 80
> L.Ed.2d 732 (1984) (White, J., dissenting) ("[T]he requirement that a
> misdemeanor must have occurred in the officer's presence to justify a
> warrantless arrest is not grounded in the Fourth Amendment.").

*Atwater v. City of Lago Vista* 532 U.S. 318, 341 n.11 (2001).  Indeed, a Seventh Circuit opinion

intimates that an "in the presence" requirement should be rejected under federal law.

> The Supreme Court has never held that a police officer violates the Fourth
> Amendment merely by arresting someone without a warrant for a
> misdemeanor offense which did not occur in the officer's presence and/or
> did not involve a breach of the peace.   Rather, when determining the

19

> constitutionality of a warrantless arrest for a criminal offense, the Court
> has repeatedly focused its inquiry on the existence of probable cause for
> the arrest.  *See, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975).

*Woods v. City of Chicago,* 234 F.3d 979, 991-92 (7th Cir. 2000), *cert, denied,* 534 U.S. 955

(2001).[13]

    If *Woods* was correctly decided, the only issue for Fourth Amendment purposes is

whether the warrantless misdemeanor arrest of Sweat is supported by probable cause.  However,

I still could not reach a dispositive decision on the probable cause inquiry.  The officers' reports

on what led them to Plaintiff are unclear at best, contradictory at worst, and do not provide the

totality of circumstances relevant to the inquiry.  Therefore, issues of fact must be better clarified

and  resolved before judgment would be appropriate.

### B.  Stop & Frisk Of Sweat as the Target Of Burglary Investigation

    Defendants contend that the feathers were lawfully obtained during the December 24th

"stop and frisk" under *Terry v. Ohio,*  392 U.S. 1 (1968) and *United States v. Hensley,* 469 U.S.

221 (1985).  They so maintain because Plaintiff was the suspect in the burglary, *see Doc. 25* at 7-

8, and because they allegedly knew he carried a knife, *see Doc. 40* at 8.  It is undisputed that the

encounter was not consensual.

    *Hensley,* however, appears inapposite since it deals with the situation "where police have

been ***unable to locate*** a person suspected of involvement in a past crime."  *Hensley,* 469 U.S. at

229.  The police clearly knew where to find Sweat, and he had already cooperated with the police

by answering questions at the police station less than 48 hours earlier.  *Hensley* expressly did

---

    [13]  For general discussions of when law is clearly established, see *Brosseau v. Haugen,* ___ U.S.
___, 125 S. Ct. 596 (2004); *Hope v. Pelzer,* 536 U.S. 730 (2002); *Mimics, Inc.,* 394 F.3d at 842; *Roska,*
328 F.3d at 1248.

"**not decide . . .  whether Terry stops to investigate all past crimes, however serious, are permitted.**"  *Id.* (emphasis added).  Neither *Hensley,* nor any cases I have found, address what appears to be the situation here: an officer stopping the easily located target of an investigation for the sole purpose of gathering evidence and then obtaining incriminating evidence during a frisk purportedly for officer's safety.  *Compare United States v. Marxen,* 410 F.3d 326 331-32 (6th Cir. 2005) (stop of car matching description and license plate of one involved in an armed robbery was permissible for the purpose of investigating whether the **car** would yield evidence of a crime, even though the officers had no reasonable suspicion that the **driver** of the vehicle had committed the crime).

Once again, the facts are insufficiently developed to determine whether *Hensley* applies to the present scenario or if the officers could have reasonably believed that their actions conformed to the law.  In the absence of further development of what happened on December 22nd and 24th, summary judgment cannot be entered on the qualified immunity issue.

### C. Appointment of Counsel

Under 28 U.S.C. § 1915(e)(1), this Court "may request an attorney to represent any person unable to afford counsel."  Although the ability to do so is not contingent on an express request by the Plaintiff, Sweat requested counsel at the outset and the request was denied very early in the proceedings.  *See Doc. 4.*

Plaintiff is incarcerated.  Although he appears adept at presenting his claims and filing responses and I believe he could represent himself at a court-directed and court-assisted settlement conference, he is not in a position to investigate the facts or undertake in-depth legal research.  The logistics and cooperation required for an inmate to undertake discovery of a city

police department and its officers are daunting.  Further, even if some of his theories of recovery seem patently meritless (*see, e.g.*, his Eighth Amendment and excessive use of force), I need not discuss them at this time because the two claims discussed above are colorable and involve relatively complex factual and legal issues that are not yet adequately developed or briefed by either party.  A possible municipal liability claim will either easily resolve on a decision of the above two claims in Defendants' favor, or will require an investigation of the underlying facts that Plaintiff is in no position to undertake.

For all these reasons, in light of the present posture of the case, I believe that it is appropriate to ascertain if counsel is available to represent Plaintiff.  *See, e.g., Rucks v. Boergermann,* 57 F.3d 978, 979 (10th Cir. 1995); *Williams v. Meese,* 926 F.2d 994, 996 (10th Cir. 1991).

Wherefore,

**IT IS HEREBY ORDERED AS FOLLOWS:**

1. The Clerk substitute Officer Carlos Wooten and Officer Rob Peterson for the John Doe Defendant, Bill Baker for the John Doe Chief of Police, and City of Las Cruces for the Police Department;

2. The Clerk send a new consent/nonconsent form to Defendants' counsel, and Defendants file their consent/nonconsent form within ten days of receipt of this memorandum opinion;

3. The pending motions *(Docs. 24, 36)* are DENIED WITHOUT PREJUDICE; and

4. This matter is referred to the *Pro Se* Civil Rights Selection Committee for review and possible appointment of counsel under the Court's *Pro Bono* Plan for discovery, settlement, additional dispositive motions, and trial.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.

22